713 A.2d 411

RITA KERNAN, PLAINTIFF–RESPONDENT, v. ONE WASHING-
TON PARK URBAN RENEWAL ASSOCIATES, DEFENDANT–
APPELLANT, v. INTERNATIONAL SERVICE SYSTEM, INC.,
ABC CORPORATION 1–5, (SAID NAMES BEING FICTITIOUS),
AND JOHN DOES 1–10, (SAID NAMES BEING FICTITIOUS),
DEFENDANTS.

Argued February 18, 1998—Decided June 12, 1998.

*Jeffrey W. Mazzola,* argued the cause for appellant (*Staehle & Smith,* attorneys).

*Richard T. Garofalo,* argued the cause for respondent (*Garrity, Graham, Favetta & Flinn,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The central question in this appeal is whether a commercial landowner in bankruptcy, who is judicially precluded from engaging in the management and control of its property by the court appointment of a trustee and managing agent, owes a duty to third persons to maintain an abutting public sidewalk in a reasonably safe condition.

I.

Following a severe snowstorm on January 17, 1994, Rita Kernan ("plaintiff") slipped and fell on an icy sidewalk abutting a commercial office building in Newark. Although the sidewalk had been sprinkled with pellets of calcium chloride, a layer of ice between one-quarter to one-half inch thick had accumulated on the sidewalk. As a result of her fall, plaintiff fractured her left hip. At all times relevant to this action, the building adjacent to the sidewalk has been owned by defendant-petitioner, One Washington Park Urban Renewal Associates ("OWPURA").

Prior to plaintiff's fall, OWPURA filed a Chapter 11 bankruptcy petition. Subsequently, the United States Bankruptcy Court appointed a Trustee in Bankruptcy ("Trustee") to oversee OWPURA's estate. On May 24, 1991, the Trustee obtained a court order authorizing him to retain McCormick Bank Street Investment Company, a real estate property management company doing business as McCormick Organization ("McCormick"), as managing and disbursing agent for the premises at One Washington Park. In his deposition, William Styles, McCormick's Executive Vice President, explained that his company was responsible for "man-

ag[ing] the building and pay[ing] the bills." Specifically, McCormick's duties with regard to One Washington Park included "leasing, rental collection, tenant contact, daily tenant contact if necessary and submitting accounting reports to the courts or to the owners of the property monthly." In addition, McCormick was responsible for maintaining the interior and exterior of the building and hiring vendors to operate the building.

McCormick employed engineers from International Service System, Inc. ("ISS") to remove snow and ice from the sidewalks adjacent to the building. Specifically, that responsibility was delegated to the chief building engineer, Robert Lone. Styles instructed Lone to use rock salt on the blacktop and calcium chloride on the sidewalk when needed. Other than those limited directions, Styles provided the one-time instruction to Lone "to remove the ice or snow. How was left up to him." Nevertheless, McCormick remained an integral part of the management of One Washington Park. Styles stated at deposition that he frequently visited the premises and maintained daily contact with Lone regarding the maintenance of the exterior of the building at One Washington Park. Although Lone received the necessary funds to purchase supplies such as calcium chloride from OWPURA, McCormick paid the bills for snow and ice removal. McCormick also paid the employees of ISS.

On October 27, 1994, plaintiff filed a complaint against OWPURA and ISS in the Superior Court of New Jersey, Law Division, Essex County. In its answer, OWPURA recounted several affirmative defenses, including the defense that "plaintiff fail[ed] to state a claim on which relief [could] be granted," and that "[t]he alleged damages were caused by other persons over whom this defendant had no control." Subsequently, discovery between the parties ensued. Although plaintiff inquired about the owner of the building at One Washington Park in her interrogatories submitted to OWPURA, OWPURA at no time indicated its bankruptcy status. Rather, its answers to plaintiff included the cursory information that the premises were owned by OWPURA, but were

in the care of a "Court appointed Manager." Although it would certainly have been prudent for plaintiff's counsel to inquire further regarding the position of the court-appointed manager, it is evident from the record that petitioner's counsel was less than forthcoming in revealing the fact that OWPURA had filed a Chapter 11 bankruptcy petition approximately three years prior to plaintiff's accident.

On July 1, 1996, defendant ISS moved to bifurcate the trial, severing the issues of liability and damages. That motion was granted and a trial regarding the liability of defendants ISS and OWPURA was held. At the conclusion of plaintiff's case on liability, both defendants moved for an involuntary dismissal pursuant to *Rule* 4:37–2(b). The trial court granted the motion based on two findings: (1) plaintiff failed to present a *prima facie* case of negligence on the part of either defendant, and (2) OWPURA owed no duty to plaintiff because it had no control over the operations at One Washington Park due to its bankruptcy status.

On appeal, the Appellate Division reversed and remanded for further proceedings. The panel concluded that, viewing the evidence most favorably to plaintiff, she presented a *prima facie* case against both defendants. Although the panel recognized that "control is a critical factor" in determining the duty of a landowner to a third party, *see, e.g., Wickner v. American Reliance Ins. Co.,* 141 *N.J.* 392, 397, 661 *A.*2d 1256 (1995), the court declined to rule on the implications of OWPURA's bankruptcy status on its potential liability for plaintiff's fall because "the issue [did not] properly present itself for dispositive consideration." Noting that OWPURA did not raise its bankruptcy status as an affirmative defense,[1] the court emphasized that plaintiff did not learn of the bankruptcy proceeding until just a few days before trial. The Appellate Division held that plaintiff should be permitted to timely amend

[1] Although we conclude that OWPURA should have been more forthcoming to plaintiff with regard to its bankruptcy status, we observe that its bankruptcy petition is not an affirmative defense that is waivable under *Rule* 4:6–7.

her complaint to add McCormick as a defendant should she choose to do so.

Both OWPURA and ISS filed petitions for certification. This Court denied ISS's petition, 151 *N.J.* 465, 700 *A.*2d 878 (1997), but granted OWPURA's petition, 153 *N.J.* 48, 707 *A.*2d 151 (1997). We now modify the Appellate Division decision and remand to allow plaintiff the opportunity to amend her complaint as is appropriate. With regard to OWPURA's liability, however, we find that OWPURA did not owe a duty to maintain the abutting public sidewalk. That finding is based, not on OWPURA's bankruptcy status, but rather on the bankruptcy court's appointment of a trustee and managing agent who assumed control of the premises at One Washington Park and precluded OWPURA's participation in maintaining the building and its adjacent sidewalks.

## II.

To recover under a negligence theory, it is paramount that a defendant first owe the plaintiff a duty. *Carvalho v. Toll Bros. & Developers,* 278 *N.J.Super.* 451, 457, 651 *A.*2d 492 (App. Div.1995), *aff'd,* 143 *N.J.* 565, 675 *A.*2d 209 (1996); *see Strachan v. John F. Kennedy Mem'l Hosp.,* 109 *N.J.* 523, 529, 538 *A.*2d 346 (1988); *Globe Motor Car Co. v. First Fidelity Bank,* 273 *N.J.Super.* 388, 393, 641 *A.*2d 1136 (Law Div.1993), *aff'd,* 291 *N.J.Super.* 428, 677 *A.*2d 794 (App.Div.), *certif. denied,* 147 *N.J.* 263, 686 *A.*2d 764 (1996). "The question of whether a duty exists is a matter of law properly decided by the court, not the jury." *Carter Lincoln–Mercury, Inc. v. EMAR Group, Inc.,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994). In determining whether a duty exists, the Court's analysis " 'involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.' " *Ibid.* (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)); *see also Goldberg v. Housing Auth.,* 38 *N.J.* 578, 588, 186 *A.*2d 291 (1962) ("[T]he question is one of fairness in the light of the nature

of the relationship, the nature of the hazard, and the impact of such a duty on the public interest."). Whether OWPURA owes a duty to plaintiff depends on what effect the appointment by the bankruptcy court of a trustee and managing agent to manage the premises at One Washington Park has on OWPURA's ability to participate in the daily management of the premises and its authority to control the snow and ice removal on the day of plaintiff's fall.

### A.

The filing of a bankruptcy petition suspends the normal operation of the rights and obligations between a debtor and its creditors. 9 *Am.Jur.2d Bankruptcy* § 1 (1991). In this case, OWPURA filed a petition pursuant to Chapter 11 of the Bankruptcy Code ("Code"), 11 *U.S.C.A.* §§ 1101 to 1174. The primary purpose of Chapter 11, which is entitled "Reorganization," is the rehabilitation of financially troubled businesses, *see NLRB v. Bildisco*, 465 *U.S.* 513, 527, 104 *S.Ct.* 1188, 1196, 79 *L. Ed.*2d 482, 496 (1983); *In re 312 W. 91st St. Co.*, 35 *B.R.* 346, 347 (Bankr. S.D.N.Y.1983); *In re Langley*, 30 *B.R.* 595, 605 (Bankr.N.D.Ind. 1983), and the prevention of unnecessary liquidations, *see In re Piece Goods Shops Co.*, 188 *B.R.* 778, 790 (Bankr.M.D.N.C.1995); *In re Chugiak Boat Works, Inc.*, 18 *B.R.* 292, 293 (Bankr.D.Alaska 1982).

In accordance with those principles, it is ordinarily presumed that a debtor who files a Chapter 11 bankruptcy will remain in control of its estate. 9 *Am.Jur.2d Bankruptcy* §§ 275, 343 (1991); *In re Heck's Properties, Inc.*, 151 *B.R.* 739, 756 (S.D.W.Va.1992). That presumption has been characterized as "strong." 9 *Am.Jur.2d Bankruptcy* § 275 (citing *In re Clinton Centrifuge, Inc.* 85 *B.R.* 980, 984 (Bankr.E.D.Pa.1988)). Following the bankruptcy petition, the debtor becomes the "debtor in possession." 11 *U.S.C.A.* § 1101. The debtor and the debtor in possession, while remaining the same business entity, are no longer the same legal entity. *In re Harms*, 10 *B.R.* 817, 821 (Bankr.D.Colo.

1981). Rather, the debtor in possession is a new entity with its own rights and duties, subject to the supervision of the bankruptcy court. 9 *Am.Jur.2d Bankruptcy* § 342 (1991); *see also* Raymond T. Nimmer & Richard B. Feinberg, *Chapter 11 Business Governance: Fiduciary Duties, Business Judgment, Trustees and Exclusivity,* 6 *Bankr.Dev. J.* 1, 20–21 (1989) [hereinafter *Chapter 11 Business Governance* ] ("The DIP [debtor in possession] is a legal fiction through which are channeled various important functions in Chapter 11 bankruptcy.... The DIP does not exist and has no role except in relationship to the bankruptcy."). However, it is important to note that the debtor becomes the debtor in possession only in cases where a trustee has not been appointed. 11 *U.S.C.A.* § 1101(1). Therefore, in this case, OWPURA was divested of the status of a debtor in possession on the appointment of the Trustee.

Plaintiff argues that OWPURA should not be absolved of liability because the debtor and the debtor in possession are only nominally separate entities. Consequently, plaintiff argues, the liabilities of the debtor should not be altered by the filing of a bankruptcy petition. If OWPURA remained "in possession" of the premises at One Washington Park, then plaintiff's argument would follow logically. After all, "unless or until a trustee steps into the picture, there are no separate entities or reason for making a further, artificial separation. The debtor has merely taken on additional obligations and powers." *Chapter 11 Business Governance, supra,* 6 *Bankr.Dev. J.* at 23. Here, however, there was a trustee appointed and, as a result, there is a distinction between the debtor and its bankruptcy estate. In order to administer the debtor's estate, "one must either give control to the management [of the business debtor] ... to the owners ... to the court, or to a trustee." *Chapter 11 Business Governance, supra,* 6 *Bankr.Dev. J.* at 23. In this case, the control was granted to the Trustee. "The important conceptual transformation here is that the owners of the prebankruptcy debtor do not necessarily retain sole or even primary control of their managers or the legal entity after filing." *Id.* at 25.

The appointment of a trustee in a Chapter 11 reorganization case is the exception and not the rule. 9 *Am.Jur.2d Bankruptcy* § 271 (1991). Following the commencement of a Chapter 11 bankruptcy, a "party in interest" may request the bankruptcy court to appoint a trustee to oversee the debtor's estate, provided the request is made prior to confirmation of a plan. 11 *U.S.C.A.* § 1104; *see also* 9 *Am.Jur.2d Bankruptcy* §§ 271, 275, 278 (1991); *Chapter 11 Business Governance, supra,* 6 *Bankr.Dev. J.* at 55. In deciding whether to appoint a Chapter 11 trustee, the bankruptcy court is called upon to make "a close and careful scrutiny of the debtor in possession's prior and present conduct and determine that a trustee will accomplish the goals of a Chapter 11 plan more efficiently and effectively." 9 *Am.Jur.2d Bankruptcy* § 276 (1991).

Specifically, the court must consider

(1) the overall management of the debtor corporation; (2) the experience, skills, and competence of the debtor in possession to manage; (3) the performance of the debtor in possession, both past and present; and (4) the trust and confidence in the debtor in possession by members of the business community with whom the debtor in possession has had, and must of necessity continue to have, business transactions.

[*Ibid.* (citing *In re Parker Grande Dev., Inc.* 64 *B.R.* 557, 561 (Bankr.S.D.Ind. 1986)).]

In addition, the bankruptcy courts have considered

(1) the trustworthiness of the debtor; (2) the reasons the debtor acted as he did; (3) reliance and harm to another party; (4) conclusive evidence of detriment to the estate; and (5) possibilities of future rehabilitation.

[*Ibid.* (citing *In re Evans,* 48 *B.R.* 46, 48 (Bankr.W.D.Tex.1985); *In re Tyler,* 18 *B.R.* 574, 576 (Bankr.S.D.Fla.1982)).]

Moreover, the courts have held that neither dissatisfaction with a debtor's management nor slight evidence of imprudent business decisions is sufficient in itself to permit the appointment of a trustee. *Id.* §§ 276, 347; *see also Chapter 11 Business Governance, supra,* 6 *Bankr.Dev. J.* at 55–57, 60 ("The Code does not contemplate that the DIP be replaced by a trustee simply because a court believes that someone else would operate the business more effectively."). The Code provides for the appointment of a trustee either "for cause," 11 *U.S.C.A.* § 1104(a)(1), or if such

appointment is "in the interests of creditors ... and other interests of the estate," 11 *U.S.C.A.* § 1104(a)(2). The most common bases for granting the request of a party in interest to appoint a trustee include "gross mismanagement and incompetence" and "DIP misconduct or self-dealing." *Chapter 11 Business Governance, supra,* 6 *Bankr.Dev. J.* at 57–58.

The United States Supreme Court has noted that "the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor." *Commodity Futures Trading Comm'n v. Weintraub,* 471 *U.S.* 343, 352, 105 *S.Ct.* 1986, 1993, 85 *L. Ed.*2d 372, 381 (1985). Upon appointment, the trustee is automatically substituted for the debtor in possession in any pending action, proceeding, or matter. 9 *Am.Jur.2d Bankruptcy* § 271 (1991). In addition, a trustee has broad rights, powers, and duties under Chapter 3 of the Code, including the capacity to sue and be sued, 11 *U.S.C.A.* § 323(b), the authority to retain professional persons, 11 *U.S.C.A.* § 327, and the power to use, sell, or lease property of the estate, 11 *U.S.C.A.* § 363. In a Chapter 11 reorganization, a trustee has additional duties to the general powers listed above. Of relevance to this case, a Chapter 11 trustee is required to

investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a [reorganization] plan.

[11 *U.S.C.A.* § 1106.]

As part of that authority, the trustee may operate the business of the debtor, 11 *U.S.C.A.* § 1108, and has considerable leeway to exercise his business judgment in running that business, 9 *Am. Jur.2d Bankruptcy* § 310 (1991).

In this case, the bankruptcy court granted a party's petition to appoint a trustee. Although the record does not indicate the reasons why the court deemed it necessary to appoint the Trustee, given the extraordinary nature of such an appointment in a Chapter 11 reorganization it is evident that the bankruptcy court found that it was required and that OWPURA's

estate would best be managed and controlled by someone other than the debtor. A similar finding of cause or necessity to the estate formed the basis of the court's granting of the Trustee's application to authorize the employment of McCormick as managing agent of the premises at One Washington Park. A trustee must obtain leave of the court before he can delegate any of his specific duties as representative of the court. *See In re Lowry Graphics, Inc.,* 86 *B.R.* 74, 76 (Bankr.S.D.Tex.1988). Such court authorization was obtained by the Trustee in his application to the bankruptcy court in May 1991, at which time, McCormick was retained as the management company for One Washington Park.

## B.

The crux of OWPURA's defense is not that it should be immunized from liability for plaintiff's fall simply because it filed for bankruptcy, but that because of the appointment of the Trustee and McCormick, as well as the subsequent employment of ISS, it owed no duty to plaintiff. According to OWPURA, it lacked the ability to participate in the daily management of One Washington Park and had no authority to control the snow and ice removal on the day of plaintiff's fall. We agree.

The Third Circuit has recognized that, upon appointment, a trustee is vested with title to all of a debtor's property. *Hanover Ins. Co. v. Tyco Indus., Inc.,* 500 *F.*2d 654, 656 (1974). Other courts similarly have recognized the exclusive authority of the trustee to exercise control over the *res* of the debtor's bankruptcy estate. *See, e.g., In re Moffitt,* 146 *B.R.* 364, 367 (Bankr.S.D.Tex. 1992) (recognizing that funds of bankrupt's estate "constitute a res over which a Chapter 11 Trustee has care, custody, control and responsibility"); *In re United Church of the Ministers of God,* 74 *B.R.* 271, 279 (Bankr.E.D.Pa.1987) (granting request to appoint trustee in Chapter 11 case based on consensus of all parties involved that "it is in the best interests of everyone and the public interest to place the assets of the estates of the [debtor and debtor corporation] *out of the control* of [the debtor]") (emphasis added);

*In re Brown,* 40 *B.R.* 728, 732 (Bankr.D.Conn.1984) (recognizing that "a Chapter 11 trustee is responsible for all of the property of the estate").

Because a trustee has such control, the predecessor in title context lends the Court some guidance in determining whether the vesting of title in the Trustee should insulate OWPURA from liability for plaintiff's injuries. This Court addressed the issue of a predecessor in title's liability for injury to a third person in *Cogliati v. Ecco High Frequency Corp.,* 92 *N.J.* 402, 456 *A.*2d 524 (1983). In *Cogliati, supra,* an injured pedestrian who fell on a public sidewalk brought suit against the adjoining landowner. In response, the adjoining landowner filed a cross claim against its predecessor in title for contribution. In discussing the obligation of a prior owner, the Court noted the general rule that a seller of property is not subject to liability for an injured third person once the buyer has taken possession. *Id.* at 407, 456 *A.*2d 524. The policy underlying that rule is that the predecessor "ha[s] no right to enter and repair the walk, for the property [i]s no longer his. It [i]s the buyer who [i]s now in control and accordingly it [i]s his obligation to remedy the condition." *Id.* at 408, 456 *A.*2d 524; *see also McQuillan v. Clark Thread Co.,* 12 *N.J. Misc.* 409, 411–12, 172 *A.* 370 (Sup.Ct.1934) ("Where there has been a transmutation of title and possession, the former owner has no control over the premises, and he does not have the right of possession nor the right of entry. . . . Having divested himself of all rights in regard to the property, he owes no duty with respect to the condition of the premises.").

Focusing on the measure of control of the parties, the *Cogliati* Court analogized the relationship between a predecessor in title and an owner to a third party with the relationship between an independent contractor and an owner to a third party. 92 *N.J.* at 409, 456 *A.*2d 524. The Court observed that an independent contractor's duty to third persons, injured because of a dangerous condition created by the contractor, ended when the contractor's work was completed and accepted by the owner. *Ibid.* (citing

*Miller v. Davis & Averill,* 137 *N.J.L.* 671, 61 *A.*2d 253 (E. & A.1948)). The principle underlying that rule, as in the context of a predecessor in title, was "that since possession and control were exclusively in the owner, the independent contractor had no authority or permission to rectify the condition on property not belonging to him. Since the contractor could not lawfully effect a remedy, his duty had terminated." *Ibid.*

In contrast, where control is retained by the seller, liability continues despite the conveyance of title to another. *See East Jersey Water Co. v. Bigelow,* 60 *N.J.L.* 201, 38 *A.* 631 (E. & A. 1897). The *Cogliati* Court concluded that the "preferable doctrine" is to hold the predecessor in title liable for a continuing dangerous sidewalk condition, provided the predecessor "created or maintained" that condition. 92 *N.J.* at 412, 456 *A.*2d 524; *see also Wickner, supra,* 141 *N.J.* at 397, 661 *A.*2d 1256 (explaining that *Cogliati* imposition of liability on prior owner was based on "the fact and incidents of ownership, [and] the ability to have controlled the property"). The *Cogliati* decision rested in part on the observation that the party at fault should not be relieved of liability. 92 *N.J.* at 412, 456 *A.*2d 524.

OWPURA asserts a similar argument in this case. Although the nominal "owner" of the premises at One Washington Park, OWPURA had no right to enter the property to fix any icy condition of the adjoining sidewalk. Furthermore, OWPURA did not create any dangerous condition. Rather, the accumulation of snow and ice was the result of natural causes and OWPURA had no right to enter the premises to rectify that condition. Therefore, OWPURA owed no-duty to plaintiff to maintain the abutting public sidewalk free from snow and ice on the day of her fall.

C.

We emphasize that our holding here is based on the unique status of OWPURA as a Chapter 11 debtor where the bankruptcy court has appointed a trustee and managing agent. Numerous cases have recognized that a trustee is the agent for the bankrupt-

cy court and for creditors. *See, e.g., Tennsco Corp. v. Estey Metal Prods., Inc.,* 200 *B.R.* 542, 545 (D.N.J.1996) ("Bankruptcy trustees differ from other types of trustees, in that bankruptcy trustees are quasi-public officials, and are appointed by the court for the estate."); *In re Beck Indus., Inc.,* 725 *F.*2d 880, 888 (2d Cir.1984) (recognizing that bankruptcy trustee is officer of court).

Because the trustee is appointed as an agent and officer of the bankruptcy court, and because he acts as the "representative of the estate," plaintiff's contention that McCormick and ISS were agents of OWPURA is wrong. It is well-established that "[a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortgage Corp. v. Rose,* 134 *N.J.* 326, 337, 634 *A.*2d 74 (1993); *see also M. Dean Kaufman, Inc. v. American Mach. & Foundry Co.,* 102 *N.J.Super.* 1, 12, 245 *A.*2d 202 (App.Div.1968) (" 'An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.' ") (quoting *Restatement (Second) of Agency* § 15, at 82 (1958)), *aff'd,* 54 *N.J.* 239, 254 *A.*2d 786 (1969). "A necessary element of any agency relationship is the right of the principal to control the conduct of the agent." *Arcell v. Ashland Chem. Co.,* 152 *N.J.Super.* 471, 494, 378 *A.*2d 53 (Law Div.1977). That element of control is simply lacking between OWPURA and the Trustee and between OWPURA and McCormick. In this case, the Trustee was appointed only as an officer of the bankruptcy court and as the agent of the estate and its creditors.

The outcome would be different had OWPURA remained the debtor in possession. In the typical Chapter 11 case, OWPURA would have retained control over its property and could have ensured that the abutting sidewalk was maintained in a reasonably safe condition. The principal reason why the appointment of a trustee in a Chapter 11 reorganization is such an extraordinary measure is because the Bankruptcy Code presumes that the debtor will remain in possession and exercise control over its

property. Because a trustee can be appointed only upon a finding of "cause" or "in the [best] interests" of the estate and creditors, 11 *U.S.C.A.* § 1104(a)(1), (a)(2), it is apparent that the primary purpose of appointing the Trustee and McCormick in this case was to remove the control of One Washington Park from OWPURA. OWPURA exercised no control over that property and hence had no duty to plaintiff to maintain the abutting sidewalk.

### D.

We now briefly address the Appellate Division's finding that the only impact that bankruptcy law has on this case derives from the provision for an automatic stay pursuant to 11 *U.S.C.A.* § 362(a).

The purpose underlying the automatic stay provision of the Code is to "preserve[ ] the status quo of the bankruptcy estate as of the date of the commencement of the bankruptcy case." 9A *Am.Jur.2d Bankruptcy* § 1369 (1991). Notably, however, the automatic stay does not apply to post-petition claims. *Id.* § 1382; Bryan Krakauer, *Automatic Stay and Adequate Protection, in* Current Developments in Bankruptcy and Reorganization 1989, at 761, 774–76 (PLI Commercial Law & Practice Course Handbook Series No. A4–4253, 1989); *see Johnson v. Garden State Brickface & Stucco Co.,* 150 *B.R.* 617, 618 (E.D.Pa.1993); *In re M. Frenville Co.,* 744 *F.*2d 332, 335 (3d Cir.1984), *cert. denied,* 469 *U.S.* 1160, 105 *S.Ct.* 911, 83 *L. Ed.*2d 925 (1985); *In re York,* 13 *B.R.* 757, 758 (Bankr.D.Me.1981). Rather, the stay applies solely to claims against the debtor that arose prior to the bankruptcy petition. 9A *Am.Jur.2d Bankruptcy* § 1382 (1991) ("[S]taying claims which arise after the petition is filed would discourage most creditors, particularly postpetition creditors, from conducting any business with the debtor, so that the reorganization purpose of the bankruptcy laws would be ill-served by construing the automatic stay to preclude actions with respect to postpetition claims."); *see also Id.* § 1385; *Turner Broad. Sys., Inc. v. Sanyo Elec., Inc.,* 33 *B.R.* 996, 999 (N.D.Ga.1983) (the stay "neither expressly nor implicitly prohibits" actions or proceedings

based on "causes of action which arise after the petition in bankruptcy is filed"), *aff'd,* 742 *F.*2d 1465 (11th Cir.1984).

██ In this case, it is clear that plaintiff's claim against OWPURA arose in 1994, nearly three years after OWPURA filed its bankruptcy petition. As a result, contrary to the Appellate Division's finding, the automatic stay provision of the Code does not affect this action.

## III.

██ In considering defendants' motions for involuntary dismissal, the trial court was compelled to "accept as true all evidence which supports plaintiff['s] case and give to plaintiff[ ] the benefit of all legitimate inferences which may be drawn therefrom." *Gentile v. National Newark & Essex Banking Co.,* 53 *N.J.Super.* 35, 37, 146 *A.*2d 471 (1958); *see also Davis v. Pecorino,* 69 *N.J.* 1, 3, 350 *A.*2d 51 (1975) ("To test the propriety of a judgment of involuntary dismissal, the evidence adduced from the record must be viewed in a light most favorable to the plaintiff."); *Bell v. Eastern Beef Co.,* 42 *N.J.* 126, 129, 199 *A.*2d 646 (1964) (same). In accordance with that standard, we conclude that the Appellate Division properly found that plaintiff was entitled to have her case heard by the jury. Although OWPURA may not be held liable due to its lack of control over the premises at One Washington Park, we remand to allow plaintiff to proceed against ISS and, if she so chooses, to amend her complaint to include the Trustee and McCormick.

## IV.

As we noted earlier, plaintiff filed her original complaint on October 27, 1994. That complaint named "Urban Renewal Associates," "ISS Engineering Services," and "ABC Corporations 1–5 (said names being fictitious)" as defendants. On October 11, 1996, plaintiff, with the consent of the court, filed an amended complaint. The sole purpose of that amendment, however, was to

change the designation of the corporate defendants to their proper names: from Urban Renewal Associates to One Washington Park Urban Renewal Associates and from ISS Engineering Services to International Service System, Inc. No additional defendants were named.

██ Plaintiff claims that it was not until September 28, 1996, when McCormick's vice president was deposed, that she learned that OWPURA was in bankruptcy and that a trustee had been appointed by the bankruptcy court who in turn had appointed McCormick as its agent. Because the trial was set for October 7, 1996, plaintiff felt that it was too late and too prejudicial to move to amend its complaint to name the Trustee and McCormick, let alone engage in discovery concerning those defendants. In hindsight, plaintiff should have amended her complaint. It is equally clear that OWPURA's counsel should have informed plaintiff that it was in bankruptcy and that a trustee had been appointed. Notably, it appears that OWPURA's lawyer was paid by the same insurance company that also insured the Trustee and McCormick. Hence, the insurance carrier is the real party in interest in this case. That fact suggests that defendants' strategy may have been to allow the statute of limitations run against the Trustee and McCormick while the plaintiff attempted unsuccessfully to recover from OWPURA. Because the real party in interest, the insurance company, always has been aware of the proceedings initiated by plaintiff, there appears to be no prejudice in allowing the complaint to be amended to name the Trustee and McCormick.

██ *Rule* 4:9–1 requires that motions for leave to amend be granted liberally. Pressler, *Current N.J. Court Rules,* comment on *R.* 4:9–1 (1998); *see also G & W, Inc. v. Borough of E. Rutherford,* 280 *N.J.Super.* 507, 516, 656 *A.*2d 11 (App.Div.1995) ("[M]otions [for leave to amend] should generally be [liberally] granted even if the ultimate merits of the amendment are uncertain.") (citations omitted); *Cardell, Inc. v. Piscatelli,* 277 *N.J.Super.* 149, 155, 649 *A.*2d 107 (App.Div.1994) ("Leave to amend pleadings should be 'freely given in the interest of justice.' ")

(quoting *R.* 4:9–1); *Van Natta Mechanical Corp. v. Di Staulo,* 277 *N.J.Super.* 175, 187, 649 *A.*2d 399 (App.Div.1994) (same). That "broad power of amendment should be liberally exercised at any stage of the proceedings, including on remand after appeal, unless undue prejudice would result." Pressler, *Current N.J. Court Rules,* comment on *R.* 4:9–1 (1998); *see also Adron, Inc. v. Home Ins. Co.,* 292 *N.J.Super.* 463, 475–76, 679 *A.*2d 160 (App.Div.1996) ("Although the court must be concerned that 'no undue delay or prejudice will result from the amendment,' it must weigh such factors against the overriding need to seek justice.") (quoting *Tomaszewski v. McKeon Ford, Inc.,* 240 *N.J.Super.* 404, 411, 573 *A.*2d 501 (App.Div.1990)); *Coastal Group, Inc. v. Dryvit Sys., Inc.,* 274 *N.J.Super.* 171, 181, 643 *A.*2d 649 (App.Div.1994) (holding that amendment would not impose undue burden or be unfair to defendant where "claims are based on closely related factual allegations"); *Brower v. Gonnella,* 222 *N.J.Super.* 75, 80, 535 *A.*2d 1006 (App.Div.1987) ("Denial of . . . a motion [to amend] in the 'interests of justice' is usually only required when there would be prejudice to another party."). Of course, the granting of a motion to file an amended complaint always rests in the court's sound discretion. Pressler, *Current N.J. Court Rules,* comment on *R.* 4:9–1 (1998); *see also Fisher v. Yates,* 270 *N.J.Super.* 458, 467, 637 *A.*2d 546 (App.Div.1994) ("While motions for leave to amend pleadings are to be liberally granted, they nonetheless are best left to the sound discretion of the trial court in light of the factual situation existing at the time each motion is made.").

■ Although more than two years have elapsed since plaintiff was injured, we note the relevance of *Rule* 4:9–3 to this action. That rule provides in pertinent part: "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. . . ." *R.* 4:9–3. In addition, "[a]n amendment changing the party against whom a claim is asserted relates back" to the date of the original complaint, provided the

party to be added to the pleading "(1) has received such notice of the ... action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [it]." *Ibid.* We reiterate our belief that the insurance carrier of McCormick and the Trustee is funding OWPURA's defense in this action.[2] Therefore, it appears that the party that may ultimately be responsible for plaintiff's claim received notice of these proceedings within the two-year statute of limitations applicable to plaintiff's action, *N.J.S.A.* 2A:14–2.

> This Court has previously noted that the relation back rule should be liberally construed. Its thrust is directed not toward technical pleading niceties, but rather to the underlying conduct, transaction or occurrence giving rise to some right of action or defense. When a period of limitation has expired, it is only a distinctly new or different claim or defense that is barred. Where the amendment constitutes the same matter more fully or differently laid, or the gist of the action or the basic subject of the controversy remains the same, it should be readily allowed and the doctrine of relation back applied.
>
> [*Harr v. Allstate Ins. Co.*, 54 *N.J.* 287, 299, 255 *A.2d* 208 (1969).]

In this case, plaintiff's claim against McCormick and the Trustee is not distinctly new or different, but "germane in the sense that they arise out of the same conduct, transaction or occurrence" that underlies the present action. *Wimmer v. Coombs,* 198 *N.J.Super.* 184, 188, 486 *A.2d* 916 (App.Div.1985); *see also Cockinos v. GAF Corp.,* 259 *N.J.Super.* 204, 209, 611 *A.2d* 1154 (Law Div.1992) ("If the amendment asserts a germane claim, then it is entitled to relation back.")

Furthermore:

> [i]n the context of amended pleadings, an accommodation has traditionally been made between the defendant's right to rely on the repose afforded by the statute of limitations and the right of the plaintiff to correct pleading errors or to respond affirmatively to his acquisition of new information respecting his claim. This

---

[2] Should the trial court determine on remand that the insurance company funding OWPURA's defense is not the same insurance carrier for McCormick and the Trustee, then the court should conduct a hearing to determine whether plaintiff can amend her complaint to add McCormick and the Trustee as parties.

accommodation is based on the perception that a person who has timely notice of the pendency of an action ... cannot reasonably object to the late assertion against him ... provided he is reasonably chargeable with the knowledge that those other claims would have been timely asserted against him but for plaintiff's error or lack of information and provided further that the late assertion does not prejudice him in maintaining his defense.

[*Wimmer, supra,* 198 *N.J.Super.* at 188–89, 486 *A.*2d 916.]

We conclude that an amendment by plaintiff to her complaint to add McCormick and the Trustee does not introduce a new cause of action barred by the statute of limitations. Rather, such an amendment merely sets forth a claim arising out of the conduct, transaction, or occurrence already set out in the original complaint. Because there was notice of plaintiff's action, our holding does not offend the policy underlying the statute of limitations, *see City of Trenton v. Fowler–Thorne Co.,* 57 *N.J.Super.* 196, 207, 154 *A.*2d 369 (App.Div.1959), *aff'd o.b.* 32 *N.J.* 256, 160 *A.*2d 131 (1960), and "accomplish[es], consistent with the general aim and policy of [the Court Rules] ... substantial justice on the merits by permitting a technical ... flaw to be corrected where such correction will not materially prejudice another party." Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 4:9–3 (1998).

The judgment of the Appellate Division is affirmed in part and modified in part, in accordance with this opinion.

POLLOCK, J., concurring.

On January 17, 1994, plaintiff, Rita Kernan, fractured her hip when she fell on an icy sidewalk in Newark. Kernan filed her complaint on October 10, 1994. In her complaint Kernan alleged that she slipped and fell on the sidewalk adjacent to property owned and maintained by "the defendants Urban Renewal Associates, ISS Engineering Services and ABC Corp. 1–5 (said names being fictitious, the real names of said entities or individuals being currently unknown) located at One Washington Park, Newark, New Jersey."

Defendant One Washington Park Urban Renewal Associates (OWPURA) answered the complaint on April 3, 1995. OWPURA

stated in relevant part that it "is without knowledge or information sufficient to form a belief as to the truth of" that allegation. The answer included six affirmative defenses, including one asserting that "[t]he alleged damages were caused by other persons over whom this defendant had no control." It also included a cross-claim for contribution and indemnity against all co-defendants and a demand for discovery of plaintiff.

Plaintiff failed to answer interrogatories, and on January 8, 1996, the Law Division dismissed the complaint without prejudice. Thereafter, plaintiff sought reinstatement of her complaint, reciting that she was in poor health and that she had been hospitalized from June 12, 1995, until July 18, 1995, during which time she "was comatose and ventilator dependent for approximately five weeks." After her release from St. Barnabas she "spent two weeks at Wellkind for acute rehabilitation services," followed by "extensive therapy at Mountainview Physical Therapy in Hackettstown, N.J." Plaintiff answered the interrogatories, and the Law Division reinstated the complaint on May 19, 1996.

Following the entry of a consent order on September 13, 1996, plaintiff amended her complaint to change the designation of the corporate defendants from Urban Renewal Associates to OWPURA and from ISS Engineering Services to International Service System, Inc. (ISS).

In propounding interrogatories, plaintiff relied on the "Uniform Interrogatories to be Answered in All Personal Injury Cases: Superior Court." *See R.* 4:17–1(b); Appendix II, Form C. Uniform interrogatories 1 and 3, together with OWPURA's answers state:

1. State: (a) the full name and residence address of each defendant; (b) if a corporation, the exact corporate name; and (c) if a partnership, the exact partnership name and the full name and residence address of each partner.

The premises is owned as a partnership between Mr. Charles Geyer and Richard C. Wolffe. One Washington Park Urban Development Association, C/O Court Appointed Manager, McCormick Organization 18–22 Bank Street, Summit, N.J.

3. If you intend to set up or plead or have set up or pleaded negligence or any other separate defense as to the plaintiff or if you have or intend to set up a

counterclaim or third-party action, (a) state the facts upon which you intend to predicate such defenses, counterclaim or third-party action; and (b) identify a copy of every document relating to such facts.

The owner of the building is One Washington Park Urban Renewal Development Association, c/o Court appointed Manager, McCormick Organization, 18–22 Bank Street, Summit, N.J.

OWPURA's answers to plaintiff's interrogatories do not reveal that OWPURA had been in a Chapter 11 bankruptcy since 1991.

In fact, on May 24, 1991, the Bankruptcy Court entered an order authorizing the trustee to "retain the McCormick organization as managing agents...." The McCormick organization (McCormick) retained ISS to maintain the premises, including the sidewalk. Additionally, McCormick obtained a public liability insurance policy insuring it, OWPURA, and the trustee.

Kernan's counsel delayed taking depositions until September 28, 1996, when he learned for the first time that OWPURA was in bankruptcy. Before us, counsel acknowledged that perhaps he should have applied to the Bankruptcy Court for leave to join the Trustee. Apparently, the practice in Bankruptcy Court is for an injured party to obtain an order permitting suit against the trustee with recovery limited to the amount of the trustee's public liability insurance. Kernan's counsel explained that, because of the short time period between the deposition and the scheduled trial date, he elected to proceed to trial.

Viewing the facts charitably, defense counsel's failure to describe OWPURA's bankruptcy in its answer to the complaint might be explainable. Counsel, who was appearing for an insurance company, might not have known of the bankruptcy when he filed the answer to the complaint. By the time he submitted OWPURA's answers to plaintiff's interrogatories, however, he knew of the bankruptcy. Moreover, at no time has OWPURA claimed anything but that its failure to mention its bankruptcy was intentional. Counsel tries to justify the nondisclosure of the bankruptcy by arguing that he identified the McCormick Organization as OWPURA's property manager and that "short of disclos-

ing trial strategy, [OWPURA's] did all that it could possibly do to alert plaintiff of this issue."

The facts do not support counsel's view that he did all that he possibly could to alert plaintiff to its bankruptcy. OWPURA's pleadings and answers to interrogatories lead to the opposite conclusion, that defense counsel concealed OWPURA's bankruptcy as a matter of "trial strategy." That the strategy ultimately failed is small solace.

Nearly five years after her accident, a seriously incapacitated plaintiff still waits for her day in court. The defense "trial strategy" has imposed substantial costs on Kernan, the judicial system, and the public. The costs include the time and money spent by Kernan and defendants in hauling this case before the Law Division, the Appellate Division, this Court, and back to the Law Division. In effect, the defense "trial strategy" transformed a routine slip-and-fall case into a failed attempt at artful dodging.

The costs, however, extend beyond the parties to the judicial system and the public. The judges who have corrected the injustice to plaintiff could have dedicated their time to the causes of other litigants.

All this could have been avoided if OWPURA had stated the true facts in either its answer to the complaint or its answers to interrogatories. That plaintiff's counsel may have been remiss in making discovery begs the question whether defense counsel should have disclosed OWPURA's bankruptcy.

As the Court states:

In hindsight, plaintiff should have amended her complaint. It is equally clear that OWPURA's counsel should have informed plaintiff that it was in bankruptcy and that a trustee had been appointed. Notably, it appears that OWPURA's lawyer was paid by the same insurance company that was also the insurance company for the Trustee and McCormick. Hence, the insurance carrier is the real party in interest in this case. That fact suggests that the parties were hoping to have the statute of limitations run against the Trustee and McCormick while the plaintiff attempted unsuccessfully to recover from OWPURA.

The question logically arises whether diligent, even zealous, representation of a client justifies an attorney's nondisclosure to

an adversary in a civil action of material public information about the client. That OWPURA's bankruptcy was material is made manifest by the opinions of the Law Division, the Appellate Division, and this Court.

The Law Division dismissed Kernan's complaint for several reasons. Among the reasons was the trial court's conclusion that OWPURA did not owe a duty to Kernan because it was in bankruptcy and the Trustee had appointed McCormick as a property manager.

In reversing, the Appellate Division noted that OWPURA had not pled bankruptcy as an affirmative defense. The court acknowledged that it was not sure about the effect of the bankruptcy on the owner's liability for common-law negligence, and remanded the matter to the Law Division so Kernan could seek to join McCormick as a defendant.

The majority opinion comprehensively addresses the substantive issues. This appeal, however, raises another issue that needs addressing. The unaddressed issue concerns the obligations of lawyers to each other and to the judicial system.

The *Rules of Professional Conduct*, the *New Jersey Court Rules*, the *Principles of Professionalism for Lawyers and Judges*, and relevant judicial decisions indicate that defense counsel should have been more forthcoming. The *Rules of Professional Conduct* frame the relationship between a lawyer's duty to represent a client diligently and the lawyer's duties to the court and an adversary. Analysis of those duties begins with *RPC* 1.3 *Diligence*, which states, "A lawyer shall act with reasonable diligence and promptness in representing a client."

The analysis continues with *RPC* 3.3, which pertains to *Candor Toward the Tribunal*. As promulgated by the American Bar Association, *RPC* 3.3 provides:

(A) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.

In commenting on *RPC* 3.3, the American Bar Association states, "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."

As adopted in New Jersey, *RPC* 3.3 exceeds the requirements of disclosure imposed by the ABA version. The New Jersey version of *RPC* 3.3 mandates that a lawyer shall not knowingly "fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be misled by such failure."

*RPC* 3.4, which pertains to *Fairness to Opposing Party and Counsel,* states in relevant part:

A lawyer shall not: (d) in pretrial procedure make frivolous discovery requests or fail to make reasonably diligent efforts to comply with legally proper discovery requests by an opposing party.

The *New Jersey Court Rules* strengthen the argument that defense counsel should have disclosed OWPURA's status as a bankrupt. *Rule* 1:4–8(a) states:

Effect of Signing, Filing or Advocating a Paper.... By signing, filing or advocating a pleading ... an attorney ... certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation,

. . . .

(3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; and

(4) the denials of factual allegations are warranted on the evidence or, as to specifically identified denials, they are reasonably based on a lack of information or belief or they will be withdrawn or corrected if a reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support.

In effect, *Rule* 1:4–8(a) provides that an attorney's signature on a pleading constitutes a certification that to the best of the attorney's knowledge, information and belief, the pleading is not interposed for the purpose of delay. Read together, the *Rules of Professional Conduct* and the *New Jersey Court Rules* require what common courtesy and candor suggest, that pleadings and

answers to interrogatories should not contain half-truths intended to mislead both adversaries and the court.

Two out-of-state cases confirm that defense counsel should have disclosed to Kernan the fact of OWPURA's bankruptcy. In *Spaulding v. Zimmerman*, 263 *Minn.* 346, 116 *N.W.*2d 704 (1962), the Minnesota Supreme Court affirmed a trial court's decision to set aside the settlement of an infant's personal injury action arising out of an automobile accident. Plaintiff suffered various injuries, but his own doctors failed to detect an aneurysm in his aorta. Years later, the examining defense doctor discovered the aneurysm, which had arisen after the accident. Although the aneurysm was not detectable immediately after the accident, the accident caused the condition that gave rise to the aneurysm. Defense counsel did not disclose the existence of the aneurysm either to plaintiff's counsel or to the court when the settlement was presented for court approval. Although the Supreme Court acknowledged that "no canon of ethics or legal obligation may have required" defense counsel to disclose the aneurysm to plaintiff's counsel, it held that the trial court had not abused its discretion in setting aside the settlement.

In *Virzi v. Grand Trunk Warehouse and Cold Storage Co.*, 571 *F.Supp.* 507 (E.D.Mich.1983), plaintiff's counsel presented a personal injury action for a mediation panel at the direction of the United States District Court in Michigan. The panel evaluated the case at $35,000. Unbeknown to plaintiff's counsel, his client had died nine days before the mediation. After the mediation hearing, plaintiff's counsel learned of his client's death, but did not so inform his adversary or the court. At a subsequent pretrial conference, the case settled for $35,000. The District Court set the settlement aside at the request of defense counsel. After noting that knowledge of plaintiff's death "would have had a significant bearing on defendant's willingness" to settle, the court concluded that plaintiff's counsel owed a duty to disclose that fact to both the court and opposing counsel.

Both *Spaulding* and *Virzi* present cases with more direct court involvement than the instant case. Still, the *Virzi* court found that a lawyer's duty of candor to the tribunal extends beyond the court to opposing counsel. The *Rules of Professional Conduct* do not define the circumstances in which a lawyer's duty of diligent representation should yield to a duty of disclosure to the court or an adversary. *Spaulding* and *Virzi*, however, illustrate the willingness of courts to remedy prejudice to a party caused by a lawyer's non-disclosure of material facts, notwithstanding the failure of the *Rules of Professional Conduct* to delineate the boundaries of the overlapping duties of diligence and candor.

If counsel knew that OWPURA was bankrupt when he signed the answer to the complaint, he should have stated that fact in his answer. Compliance with *Rule* 1:4–8(a) requires more than a statement putting Kernan to her proof. A statement that OWPURA was in bankruptcy would have alerted Kernan's counsel to facts that would have enabled him to take the appropriate action.

Additionally, *Rule* 4:23 imposes sanctions for failure to make discovery. Under that rule "an evasive or incomplete answer is to be treated as a failure to answer." *R.* 4:23–1(b). OWPURA's answer, which identified McCormick as a court-appointed manager, but did not disclose that OWPURA was in bankruptcy, was incomplete and evasive. As Justice Douglas wrote, "pretrial procedures make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States of America v. Procter & Gamble Co.*, 356 *U.S.* 677, 683, 78 *S.Ct.* 983, 986, 2 *L. Ed.*2d 1077 (1958).

*Rules* 1:4–8 and 4:23 would mean little if they did not require OWPURA to have disclosed its status as a bankrupt in its answer to the complaint and in its answers to plaintiff's interrogatories. Defense counsel apparently based his "trial strategy" on the fact that OWPURA was bankrupt without disclosing that fact to Kernan's counsel. The fairer and more efficient practice would have been to disclose the fact of OWPURA's bankruptcy in its

answer to the complaint and in answers to plaintiff's interrogatories.

That practice also would comport with *Principles* 3 and 4 of the *Principles of Professionalism for Lawyers and Judges* promulgated by the New Jersey Commission on Professionalism in the Law. Those principles state in relevant part:

3.  Forms of pleading, discovery, motions, or other papers, should not be used as a means of harassment, or for gaining an unfair advantage....

4.  In the conduct of negotiations, or litigation, a lawyer should conduct himself or herself with dignity and fairness and refrain from conduct meant to harass the opposing party.

More egregious examples of discovery abuse may exist. The nondisclosure in this case, however, suffices to make the point. Shenanigans have no place in a lawsuit. Modern litigation is too time consuming and expensive for courts to tolerate discovery abuses. For over fifty years, courts have endeavored to transform civil litigation from a battle royal to a search for truth. Even before the adoption of the 1947 Constitution, courts were loath to allow defense counsel to lull their adversaries into a false sense of security that would subject claims to the bar of the statute of limitations. *Peters v. Public Serv. Corp. of N.J.*, 132 *N.J. Eq.* 500, 507, 29 *A.*2d 189 (Ch.1942). In an appropriate case, the judicial response has been to equitably estop a defendant from denying a fact that would cause a time limitation to bar a claim against the correct defendant. *Zielinski v. Philadelphia Piers, Inc.*, 139 *F.Supp.* 408 (E.D.Pa.1956). Here, the Court has devised a response that permits Kernan to proceed against the correct defendant. I join in the Court's opinion.

Justice COLEMAN joins this opinion.

*Concur in result*—Justices POLLOCK and COLEMAN—2.

*For affirmance in part, modification in part*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

Opposed—None.